Memorandum of Decision
On February 23, 1999, the Department of Children and Families (DCF) filed coterminous petitions to adjudicate Rayonna M., a minor child, neglected and abused, and to terminate the rights of her parents, Christopher M. and Melinda P. Trial took place in this court on January 10, 11, and 12, 2000. On the first day of trial, the father, Christopher M., consented to termination of his parental rights. For the reasons stated below, the court adjudicates Rayonna neglected and abused, grants the termination petition against the father, denies the termination petition CT Page 1751 against the mother, orders Rayonna committed to the custody of DCF for a period of one year with the goal of reunification with the mother, and enters orders concerning specific steps.
FACTS
The court finds the following facts and credits the following evidence. The father was twenty-two years old at the time of trial. During his teenage years, he had an alcohol problem. At age seventeen, he was arrested for driving under the influence two days in a row. In 1996, when the father was nineteen, he was convicted of third degree assault. He has used heroin and marijuana for a number of years.
The mother was born in 1979. The mother began dating the father in approximately 1996. In late 1997, the mother became pregnant through this relationship. After she became pregnant, the mother and father became engaged. While the mother was pregnant, the father was arrested and convicted in three separate incidents of third degree assault, assaulting a police officer, and reckless endangerment.[2]
Rayonna was born on August 15, 1998. The mother, who lived with her paternal grandmother, was Rayonna's primary care taker. The father, who lived with his mother and stepfather, visited Rayonna and the mother on weekends or at other times. Occasionally, the mother, father, and Rayonna would stay at the father's house. The father did not have the baby by himself for any extended period of time. At times the mother noticed that the father was careless or rough with the baby. She would tell the father to be careful or not to be rough and he would stop.
Rayonna's pediatrician had no concerns with Rayonna's health after her first five well-care visits. At Rayonna's sixth well-care visit, on December 16, 1998, the mother pointed out several small bruises on the baby's left elbow and one on the top of her ear, which the doctor noted. The mother also reported that Rayonna had been holding her left arm limply, but the doctor's office did not seem concerned with this report.
The mother brought Rayonna in to the pediatrician on January 6, 1999 because she was wheezing. No bruises were noted. On January 16, 1999, however, at the regularly scheduled well-care visit, the office noted several small bruises on the third left finger and one over the tip of the ear. This history of bruising was of CT Page 1752 concern to the office because children who are not yet mobile, such as Rayonna, should not bruise readily. The mother stated that she was not sure where the bruises were coming from and that she had been the only person with Rayonna. She did not mention the father's rough handling of the baby. The doctor's office advised the mother to call if there were more bruises.
A well-care visit to the pediatrician on February 16, 1999 revealed the baby to be developing normally. During the evening of February 18, 1999, while at the father's household in Branford, the father grabbed Rayonna's left upper arm in an apparent attempt to prevent her from falling off a couch and broke her humerus bone. On February 19, 1999, at approximately 9:30 a.m., the pediatrician's office, which is located in East Haven, received a call from a male caller in the father's household informing them that the baby had an arm injury. The doctor's office, which had opened at 9:00 a.m., called the father's household twice thereafter out of concern for the parents' subsequent failure to arrive at their office.
The parents arrived at 10:45 or 11:00 a.m. On the way to the doctor's office, the mother came up with the idea of telling the doctor that the baby had been sitting, rather than attempting to stand, when the father had grabbed the baby's arm, in an effort to avoid DCF involvement. The pediatrician's office referred the parents to the emergency department at Yale-New Haven Hospital. The nurse practitioner in the pediatrician's office called the hospital twice because she suspected child abuse and was concerned that the parents would not go.
At the hospital, the father, rather than the mother, provided the information to the examining physician. The father claimed that the baby's arm injury occurred when she rolled over to one side with her arm behind her. As he later admitted, this explanation was false. The mother seemed reserved but seemed most interested in having the doctor cease asking the father questions.
The hospital conducted a skeletal survey and complete examination of Rayonna. The X-ray of the left humerus revealed a complete break in the upper left arm. There were also fresh bruises in the crease and on the back of the left elbow. The left arm was swollen, tender, and not moving. These injuries are consistent with the baby being grabbed or jerked in this area. There was a fresh bite mark on Rayonna's left cheek, which was CT Page 1753 later found to be consistent with an adult human bite mark. Fresh bruises on the chin and chest were observed that were suggestive of someone grabbing or squeezing the child. There were fresh bruises in the genital region, swollen labia majora, and an extensive diaper rash. These injuries, aside from the diaper rash, presented the possibility of someone striking or poking the baby in the outer genital region. There was a metaphyseal fracture of the right distal tibia (lower leg) along with bruises on the left leg between the ankle and knee. The baby had shown decreased movement of the right leg upon examination. The metaphyseal fracture was less than fourteen days old and typically would result from grabbing the child and jerking hard in this area.
Because these injuries were fresh yet dispersed around the body and, in some cases, caused in different ways, the injuries most likely were caused in more than one incident between February 16, 1999, when the pediatrician found Rayonna to be developing normally, and the hospital examination on February 19. The hospital exam also revealed a healing fracture of the left radius bone (forearm) that was at least one month old. This injury may have been the one that the mother reported to the pediatrician on December 16, 1998.
The attending physician explained these findings to the parents, stated his belief that the child had been abused, and informed them that Rayonna would be admitted to the hospital. On the basis of the hospital's findings, DCF invoked a 96 hour hold on Rayonna. She was discharged on February 21 and placed in foster care. On February 23, 1999, DCF obtained an order of temporary custody and filed coterminous petitions for neglect and termination of parental rights.
On February 24, 1999, a Yale-New Haven social worker met with the mother and her grandmother. The social worker explained the severity of Rayonna's injuries. Both the mother and the maternal great-grandmother stated that the father had been rough with the baby at times. The mother also spoke to a DCF investigator on February 22, 1999 and on three or four additional occasions in the next two weeks. In those conversations, the mother denied that the father deliberately hurt the child and, at one point, stated that she could have caused the bruises on Rayonna's face by kissing her. The mother did acknowledge that the father could have could caused Rayonna's injuries by being rough. CT Page 1754
Pursuant to specific steps imposed on March 5, 1999, DCF initially asked the parents to obtain a substance abuse evaluation.[3] The mother missed the first appointment because she drove the father to work instead. She attended a second appointment and tested negative for drugs. DCF then referred the mother to Catholic Family Services for parenting and domestic violence classes, which the mother has attended and has helped her mature somewhat.
On April 27, 1999, a supervised visit of Rayonna by the parents took place at a DCF office. When the social work case aid gave the baby to the father at the outset of the visit, the father appeared to begin to kiss the baby. The baby started crying and the father stated that he thought he had bitten the baby. DCF ended the visit and returned Rayonna to her foster mother, who took Rayonna to the pediatrician. The doctor's office observed a human bite mark covering most of the baby's left cheek.
The father was arrested for this incident. During the next week, both parents were arrested for risk of injury as a result of the February 19 findings. All charges are currently pending. The court has imposed a protective order prohibiting the father from having any contact with Rayonna.
Visits between Rayonna and the mother have continued. The mother has interacted well with the baby. As of May 28, 1999, the parents were still in a relationship together. The father has continued to call the mother to find out about her visits with Rayonna. At trial, the mother claimed that she is no longer involved with the father.
The mother has discussed Rayonna's injuries with DCF on many occasions and with the court-appointed psychological evaluator on two occasions. The mother has never mentioned any physical injuries other than those that apparently occurred when the father grabbed Rayonna's arm.[4] At one meeting with DCF in April, 1999, the mother stated that she had brought Rayonna to the pediatrician in February because of a diaper rash.
Rayonna has been in the foster home of Ellen and Richard M. since her placement in February, 1999. The foster parents had to keep a wrap on Rayonna's left arm for ten weeks. Rayonna is now getting physical and occupational therapy for the arm, but she is still not using it correctly. There is some concern about nerve damage. There are currently two other foster children in the home CT Page 1755 with whom Rayonna gets along well. Rayonna calls the foster parents "Mamma" and "Dadda." They would not hesitate to adopt her if she became available.
NEGLECT ADJUDICATION
The neglect petition alleges that Rayonna was neglected in that, as provided in the relevant statute, she "is being denied proper care and attention, physically, educationally, emotionally or morally," General Statutes § 46b-120 (8)(B), "is being permitted to live under conditions, circumstances or associations injurious to his well-being," General Statutes § 46b-120
(8)(C), and "has been abused." General Statutes § 46b-120
(8)(D). The subcategories of abuse alleged are that the child "has had physical injuries or injuries inflicted upon him by other than accidental means," General Statutes § 46b-120
(3)(A), "has injuries which are at variance with the history given of them," General Statutes § 46b-120 (3)(B), and "is in a condition which is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment." General Statutes § 46b-120 (3)(B). DCF has the burden of proving these allegations by a fair preponderance of the evidence. Practice Book § 33-12. Based on the virtually undisputed evidence at trial that Rayonna suffered grievous physical injuries as a result of various nonaccidental incidents, the court finds that DCF has proven all alleged grounds of neglect and abuse by a preponderance of the evidence.
TERMINATION ADJUDICATION
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112 (c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112 (c)(1).
DCF in this case made no efforts to reunify the mother with Rayonna prior to filing for termination. DCF became involved on CT Page 1756 February 19, 1999, when a representative appeared at Yale-New Haven Hospital to investigate. Four days later, DCF filed for termination. In the interim, a DCF investigator met with the mother, but DCF did not provide, and realistically could not have provided, any meaningful rehabilitative services during this four day interim period.
After it filed for termination, DCF did refer the mother to a substance abuse evaluation, psychological evaluation, and parenting and domestic violence classes, and facilitate visitation. These undertakings are not reasonable efforts to reunify, however, because DCF did not at least give the mother a reasonable chance to benefit from these services before it filed for termination.[5] This case was not one of "concurrent planning," in which DCF contemplated both reunification and termination at the same time. Here, as of February 23, 1999, DCF had already decided to seek termination of the mother's parental rights. Although DCF did provide some services to the mother after it filed for termination, it was apparently doing so to protect the child in the event that the court denied the termination petition. If DCF truly intended to reunify mother and child through these services, then it would not have filed for termination until at least determining whether the services had repaired or could have repaired the problems in the mother-child relationship.[6]
DCF relies on two statutory exceptions to the reasonable efforts requirement. The first, codified in General Statutes § 17a-111b(a), provides, in pertinent part, as follows:
 [t]he court may determine that such efforts [to reunify] are not appropriate if: (1) the parent has subjected the child to the following aggravated circumstances: . . . (B) the parent has inflicted sexual molestation or exploitation or severe physical abuse on the child or engaged in a pattern of abuse of the child . . . [or] (2) the parent has . . . committed an assault, through deliberate, nonaccidental act, that resulted in serious bodily injury of the child. . . ."
The terms of this exception make it applicable only to a parent who has "inflicted" severe physical abuse, "engaged in" a pattern of abuse, or "committed" an assault. As DCF appropriately conceded at oral argument, there is no evidence that the mother "inflicted" the abuse or "committed" an assault on Rayonna.[7]
All the evidence in this case points instead to the father as the CT Page 1757 person who inflicted the injuries, either by deliberate act or by rough handling. At most, the mother is responsible for failure to protect the child, as DCF alleges in its social study. Such a failure to protect may well be an act of omission that constitutes a statutory ground for termination, see General Statutes § 17a-112 (c)(3)(C), but it does not constitute the sort of affirmative act of commission contemplated by §17a-111b. Accordingly, this first exception is unavailable.
DCF also relies on the language of § 17a-112 (b) to argue that the mother is "unable or unwilling to benefit from reunification efforts." The court does not believe, however, that DCF knew enough about the mother or what happened in her home between December, 1998 and February, 19, 1999 to have concluded on February 23, 1999 that the mother was unable or unwilling to benefit from reunification efforts. As Dr. Bruce Freedman, the court-appointed evaluator, stated in his report, the termination of parental rights action filed in February, 1999 "seemed premature."
The evidence paints a picture of a young, naive mother in a bad relationship for the first time rather than an incorrigible mother who repeatedly has let male partners abuse her children. It is true that the mother here missed a number of warning signals — the father's substance abuse, his criminal record for assault, his rough handling of the baby, the bruises on the baby and thus was unfortunately still in a relationship with the father when he broke Rayonna's arm on February 18. It also appears that the mother is responsible for other acts of omission in not preventing or more quickly seeking help concerning the other injuries that Rayonna suffered between February 16 and February 19. Looking at the post-petition evidence, the mother has matured somewhat but still has not cut off all contact with the father and has failed to acknowledge the full severity of Rayonna's injuries.
But the mother's shortcomings are not irremediable. Unlike many parents in the child protection system, this mother has no substance abuse problem and does not have a diagnosed mental disease or disorder. She has two arrests, but no criminal convictions. The mother interacts well with Rayonna. She has attended the counseling to which DCF has referred her and benefitted [benefited] from it somewhat. Compared to other parents that DCF attempts to rehabilitate, the mother in this case has less distance to go. See, e.g., In re Eden F., 250 Conn. 674, 678-84, CT Page 1758 ___ A.2d ___ (1999). If this mother is deemed "unable or unwilling to benefit from reunification efforts," then the parental rights of other young mothers who get into their first abusive relationship are unfairly in jeopardy. Most of these mothers should receive a fair chance to rehabilitate before the state seeks the ultimate remedy of termination.[8] There is no compelling reason in this case why the state could not have offered the mother counseling services and imposed restrictive specific steps (such as no contact with the father) before filing for termination, as it has in other cases of failure to protect. See, e.g., In re Lauren R., 49 Conn. App. 765-75, 715 A.2d 822
(1998). This court simply cannot find, even considering the post-petition evidence, that the mother's problems are of such a chronic or acute nature that the mother is "unable or unwilling to benefit" from such reunification efforts. General Statutes § 17a-112 (c)(1). Accordingly, since DCF did not make reasonable efforts to reunify and none of the exceptions to the reasonable efforts requirements applies, this court must deny the termination petition against the mother.[9]
NEGLECT DISPOSITION
Pursuant to Practice Book § 33-12, when a court denies the termination component of a coterminous petition, it must then consider any of the dispositional alternatives under the neglect petition by a fair preponderance of the evidence. This court finds by a preponderance of the evidence that the best interest of Rayonna favors commitment to DCF with the goal of reunification with the mother. As this court has found, the mother is able and willing to benefit from reunification efforts. Immediate return of Rayonna to the mother under protective supervision is not realistic, however. The mother will not be ready to have custody of Rayonna until she has established convincingly that she no longer has any relationship with the father and has made progress in developing her parenting skills and understanding the nature of abusive relationships. Further, while it is not impossible to return a young child to a parent after one year in foster care, Rayonna has been in a very caring foster home since February, 1999 and cannot simply be transferred overnight to the mother. The transition will undoubtedly take some time. It will be in both DCF's interest and the mother's interest, however, to pursue reunification without delay since the longer that Rayonna stays with the foster family the more difficult it will be for Rayonna to leave.[10]
CT Page 1759
The court accordingly orders the parties to submit, within two weeks, proposed specific steps to govern the commitment period. These steps shall, among other things, obligate DCF to pursue reunification without delay, require the mother to have no physical contact with the father, prevent the mother from placing Rayonna in the father's physical proximity, and order the mother to obtain appropriate counseling. If the parties cannot agree on the specific steps, they may submit separate proposals and the court will resolve the disputed issues.
TERMINATION DISPOSITION CONCERNING THE FATHER
Pursuant to General Statutes § 17a-112 (b)(1), when a parent consents to the termination of his rights, this court must determine by clear and convincing evidence whether termination is in the best interest of the child. The father in this case has voluntarily and knowingly consented to termination of his rights to Rayonna. The father is principally responsible for Rayonna's injuries and he faces prosecution on felony charges as a result. He has a drug problem and a criminal record for assault. Because of his own misconduct, he has not seen Rayonna since April, 1999. According to the mother, she no longer has a relationship with the father and, under the disposition ordered herein, the mother may not see him in the future. For all these reasons, termination of the father's rights is clearly in Rayonna's best interest.
CONCLUSION
Based upon the foregoing findings, the court adjudicates Rayonna neglected, grants the termination petition against the father, denies the termination petition against the mother, and orders Rayonna committed to the custody of DCF for a period of one year with the goal of reunification with the mother. The parties shall submit agreed upon or separate proposed specific steps within two weeks in accordance with this opinion.
It is so ordered.
Carl J. Schuman Judge, Superior Court